# United States District Court
# District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Leda Dunn Wettre |
| | : | |
| v. | : | Mag. No. 17-8179 |
| | : | |
| CHRISTOPHER GOODSON | : | **CRIMINAL COMPLAINT** |
| and | : | |
| ANTHONY GARVIN | : | |

I, Timothy Stillings, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

_____
Jonathan Edds
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,
on November 15, 2017 at Newark, New Jersey

_____
HONORABLE LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE
Signature of Judicial Officer

ATTACHMENT A

**Count One – Conspiracy to Commit Bank Fraud**

From in or about January 2011 through in or about August 2017, in the District of New Jersey and elsewhere, defendants

CHRISTOPHER GOODSON
and
ANTHONY GARVIN

did knowingly and intentionally conspire and agree with each other and with others to execute and attempt to execute a scheme and artifice to defraud financial institutions, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, those financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Section 1344.

In violation of Title 18, United States Code, Section 1349.

**ATTACHMENT B**

I, Jonathan Edds, am a Special Agent with the Federal Bureau of Investigation. I have conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, and have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate, and all conversations and statements described in this affidavit are related in substance and in part.

## I.   OVERVIEW OF THE SCHEME TO DEFRAUD

1.     From in or around January 2011 through in or about August 2017, defendants CHRISTOPHER GOODSON, ANTHONY GARVIN, and others (collectively, the "Co-Conspirators") engaged in a "short sale" mortgage fraud conspiracy that caused tens of millions of dollars in losses.

2.     The Co-Conspirators targeted properties in New Jersey whose mortgages were in some stage of default proceedings (the "Subject Properties"). After identifying a Subject Property, the Co-Conspirators structured two transactions in a "short sale flip" of the Subject Property:

a.     The first transaction was the sale by the original owner (the "A Owner") to a buyer (the "B Owner") (the "A-B Transaction"). In the A-B Transaction, the Co-Conspirators and others represented to the Financial Institution holding the mortgage on the Subject Property (the "A-B Financial Institution") that the B Owner was willing to pay a specific price for the Subject Property – a price less than the amount remaining on the mortgage. The Co-Conspirators thereby convinced the A-B Financial Institution to accept the sale of the Subject Property at a loss.

b.     In the second transaction, which was usually simultaneous with (or even before) the first, the Co-Conspirators arranged to "flip" the Subject Property from the B Owner to a third participant (the "C Owner") (the "B-C Transaction"). The C Owner typically obtained a mortgage from another financial institution (the "B-C Financial Institution"). The B-C Transaction invariably closed for significantly more than the A-B Transaction: usually tens of thousands of dollars more, and in some cases, more than doubling the price of the A-B Transaction.

c.     By fraudulently structuring the short sale flip of the Subject Property in this manner, the Co-Conspirators maximized the difference in

2

price between the A-B and B-C Transactions and, thereby, their profits.

3.     The Co-Conspirators rigged the short sale process at each step. The Co-Conspirators used affirmative misrepresentations and omissions at critical points in a manner calculated to advance the fraudulent scheme and to prevent the Financial Institutions from detecting it. As just some examples:

a.     The Co-Conspirators made numerous false and fraudulent statements and omissions in documents furnished to and relied upon by A-B Financial Institutions. For example, the Co-Conspirators prepared and submitted fraudulent "pre-approval letters," which asserted that the prospective B Owner qualified for a loan from an entity called "Five Star Funding" ("Five Star") that would fund the A-B Transaction, and that Five Star had reviewed various documents relating to the B Owner's financial health. In reality, Five Star was controlled by defendant GOODSON, and conducted no actual due diligence, usually because the prospective B Owner was a Co-Conspirator. A-B Financial Institutions relied upon the Co-Conspirators' fraudulent representation that Five Star was an independent entity and had agreed to fund the A-B Transaction based on what purported to be an objective analysis of the B Owner's financial profile.

b.     The Co-Conspirators fraudulently recorded the deeds to the Subject Properties to reflect closing dates significantly in advance of the actual closing date of the A-B Transaction.  Often, the B-C Transaction was funded and closed even *before* the A-B Transaction closed, using the fraudulently recorded deed. Indeed, proceeds provided by the B-C Financial Institutions for the B-C Transactions sometimes funded the A-B Transactions themselves. The fraudulently recorded deeds from the A-B Transaction also enabled the Co-Conspirators to misrepresent to the B-C Financial Institutions that the seller in the B-C Transaction had owned the property for a sufficient period of time to make them eligible for certain mortgages with more advantageous terms.

c.     The Co-Conspirators also routinely prepared and provided false and fraudulent documents, including Universal Residential Loan Applications ("URLAs"), pay stubs, bank account statements, and title reports, in mortgage loan applications to the B-C Financial Institutions, which relied on these representations in issuing mortgages to the C Owners of the Subject Properties, who, absent those fraudulent representations, would not have qualified for those mortgages.

4.     Defendants   GOODSON, GARVIN, their Co-Conspirators, and entities they owned or controlled managed each step of the fraudulent scheme. Though the specifics of the Co-Conspirators' roles and involvement varied based

on the circumstances of each transaction, in the typical transaction, the Co-Conspirators: negotiated the A-B Transaction; served as or funded the B Owner; provided false "pre-approval letters" and fraudulently recorded deeds; served as the closing attorney for the A-B Transaction; orchestrated the "flip" of the Subject Property by negotiating the B-C Transaction; and served as the closing attorney or attorney for the B Owner in the B-C Transaction.

      a.     By playing some or all of these roles, depending on the specific transaction, the Co-Conspirators were able to manipulate the market for short sale transactions and maximize their profits by deceiving the Financial Institutions.

      b.     The Financial Institutions relied on these roles being filled by unrelated parties conducting arms' length transactions. As just one example, closing attorneys, such as defendant GOODSON, have a fiduciary obligation to the Financial Institutions, who provide closing instructions to complete the transactions, and are bound to disclose known conflicts of interest.

      5.     The Co-Conspirators then split the proceeds from the fraudulent short sale transactions among themselves and others.  Once the money hit accounts they controlled, the Co-Conspirators disbursed funds among various other accounts to conceal their illegal activities and split the profits. In total, as a result of the scheme, the Co-Conspirators and others defrauded financial institutions out of more than approximately $30 million.

## II.    OVERVIEW OF THE MORTGAGE LENDING PROCESS

      6.     At various times relevant to this Complaint:

      a.     Mortgage loans were loans funded by Financial Institutions, including the A-B and the B-C Financial Institutions discussed in this Complaint. Mortgage loans enabled borrowers to finance the purchase of real estate, with the Financial Institution providing the loan retaining a secured interest in the property.

         i.     To obtain a mortgage loan, a prospective borrower ordinarily had to meet income, asset, and credit eligibility requirements. Prospective borrowers applied for mortgage loans and submitted various types of documentation to demonstrate their eligibility for mortgage loans. Financial Institutions relied upon the information submitted by borrowers in making their lending decisions.

ii.     Financial Institutions also relied upon information related to the value and chain of title of the Subject Property.  For example, and among other things, Financial Institutions examined the transaction history of the Subject Property, including the date of the most recent transfer, as well as the underlying value of the Subject Property.

iii.     If a prospective borrower met a Financial Institution's lending requirements, and the Financial Institution was satisfied with the chain of title and value of the Subject Property, the Financial Institution funded the mortgage loan, typically by causing an electronic wire transfer of funds from the Financial Institution to a settlement agent, such as a title company or a closing attorney. The settlement agent then distributed the mortgage funds pursuant to a "HUD-1."

b.     A HUD-1 was a form prescribed by the United States Department of Housing and Urban Development that includes a schedule of the borrower's and seller's charges in a real estate transaction and the disposition of funds.

c.     A deed was a document that documented the transfer of ownership of real estate. A deed was recorded by the closing agent to a real estate transaction with the relevant county agency.

d.     An attorney trust account ("ATA") was a bank account or its equivalent that was established by an attorney to hold funds belonging to clients or financial institutions.

e.     Closing attorneys were responsible for the administration and coordination of the closing of a real estate transaction, including, for example: (1) collecting the closing funds related to the transaction, including down payment funds and mortgage proceeds; (2) maintaining an ATA to safeguard the funds related to the transaction; (3) disbursing the funds related to the transaction; (4) preparing the HUD-1; (5) ensuring clear transfer of title, preparing deeds, and recording the deed; and (6) collecting and submitting documents to the Financial Institutions involved in the transaction.

f.     Certain mortgage loans were issued in connection with an insurance program administered by the Federal Housing Administration ("FHA"), a division of HUD. FHA loans protected against loan defaults by guaranteeing government-backed payments if the borrower defaulted on a mortgage loan. The FHA imposed "seasoning" requirements to mitigate against risk and fraud in the short sale real estate market. Generally,

5

pursuant to these requirements (and subject to certain exceptions), if (1) the A-B Transaction was a short sale, and (2) an FHA-backed mortgage was sought for the corresponding B-C Transaction where the purchase price of the B-C Transaction was significantly higher than the A-B Transaction, (3) the FHA required that the B-C Transaction not occur within 90 days of the A-B Transaction. Otherwise, the B-C Transaction would not be eligible for a government-backed loan guarantee.

g.     A short sale is a type of real estate transaction in which the property is sold for less than the amount owed by the seller on the underlying mortgage on the property.  A short sale involves an agreement between the seller and the lender who holds a mortgage on the property whereby the lender agrees to release its mortgage in exchange for payment of less than the total amount owed on the mortgage.  After the closing of a short sale transaction, the closing agent must record the deed in the official records of the relevant county agency in order to properly reflect the occurrence of the short sale on the date of the transaction, the parties involved, and the amount paid by the buyer.

## III.   **INDIVIDUALS AND ENTITIES**

7.     At various times relevant to this Complaint:

a.     Financial Institutions 1, 2, 3, 4, and 5 were each "financial institutions" as defined by Title 18, United States Code, Sections 20 and 27 and Title 31, United States Code, Section 5312.

b.     Defendant CHRISTOPHER GOODSON resided in New Jersey and was an attorney licensed in New Jersey. He previously was a mortgage loan officer.

c.     Defendant GOODSON owned and controlled the Goodson Law Offices, LLC ("GLO"), which was based in Montclair and later Newark, New Jersey.

d.     Defendant ANTHONY GARVIN was a resident of New Jersey. GARVIN was a licensed real estate agent in the business of buying and selling real estate. GARVIN controlled numerous entities, including Caviar Apparel Purveyors, LLC ("Caviar Apparel").

e.     CC-1 was a resident of New Jersey and was a real estate investor.

f.     CC-2 was a resident of New Jersey and owned and operated Entity 1 and, for a time, was employed by CC-3. CC-2 played several roles

in the fraudulent scheme, including notarizing documents in connection with certain fraudulent transactions.

g.     CC-3 was a resident of New Jersey and was a real estate investor. CC-3 also owned and controlled Entity 2.

h.     CC-4 was a resident of New Jersey and was a real estate agent licensed in New Jersey.

i.     CC-5 was a resident of New Jersey who negotiated short sales and processed documents on behalf of defendant GARVIN.

j.     Five Star was a New Jersey corporation owned and controlled by defendant GOODSON, and purported to be a short-term lending company physically located in San Diego, California.

k.     Grant Montgomery LLC was a New Jersey corporation owned and operated by defendant GOODSON, and which served as the B Owner for several Subject Properties.

l.     Individual 1 was a resident of New Jersey and was a real estate investor who was purportedly employed by Five Star.

m.     Entity 2 was a New Jersey corporation owned by CC-3, and which served as the B Owner for several Subject Properties, including 62 Mina Avenue, Clifton, New Jersey.

## IV.   MANNER AND MEANS OF THE SCHEME TO DEFRAUD

8.     It was part of the scheme to defraud that defendant GOODSON and others generated and transmitted false and fraudulent "preapproval letters" that purported to be from Five Star to induce the A-B Financial Institutions to accept the terms of the short sales in the A-B Transactions (the "Five Star Preapproval Letters"). Among other things, certain Five Star Preapproval Letters stated that Five Star had approved a prospective B Owner for a certain amount of loan funding based on Five Star's analysis of the B Owner's financial documents. In fact, no such analysis had been completed. The Five Star Preapproval Letters gave the false impression that Five Star's decision to provide loan funding was an arm's length transaction predicated on an independent, objective analysis of the prospective B Owner's creditworthiness. In fact, the prospective B Owner was typically a co-conspirator or otherwise affiliated or controlled by defendant GOODSON.

9.     It was further part of the scheme to defraud that defendant GOODSON and others misrepresented the nature of Five Star by concealing

defendant GOODSON's ties to, and control over, Five Star. For example:

      a.    In or about February 2010, defendant GOODSON caused a post office box to be opened in or around San Diego, California, and paid for the post office box from bank accounts that defendant GOODSON owned and controlled;

      b.    In or about March 2010, defendant GOODSON opened a bank account in the name of Five Star Funding at Financial Institution 1;

      c.    In or about July 2010, the phone number listed for Five Star Funding was obtained through a voice over internet ("VoIP") service, paid for by the GLO.  While the phone number listed for Five Star was assigned a Southern California area code, the number was part of the same VoIP account as the GLO phone numbers and other entities owned and controlled by defendant GOODSON. Moreover, the Five Star phone number rang at, and was answered at, the GLO.

      d.    Defendant GOODSON also sought to hide his connections to other entities he controlled.  For example, in or about 2014, an individual who worked at the GLO wrote a letter to a VoIP provider regarding a "special request" for the GLO.  Defendant GOODSON's employee wrote, "[o]ne of Mr. Goodson's companies (ForestOak Realty) needs to have a physical phone that is either a different color or a different model so that everyone in the office can easily identify this phone – the reason behind this request is when dealing with the various lenders we need to ensure that the Forest Oak phone is never ever used by anyone in the law office – we do not want the lenders to know of the relationship between the law office and the realty company – so we need to keep these two businesses totally separate . . . nothing associated with Goodson Law Offices, LLC can ever be discussed on that phone for any reason . . . ."

10.    It was further part of the scheme to defraud that defendant GOODSON and others fraudulently generated the deeds that recorded the transfer of title from Owner A to Owner B, making it appear as though each A-B Transaction closed earlier than it actually did.  GOODSON admitted to CW-1 that he "backdate[d] the deed either 30 to 60 days." The Co-Conspirators then frequently used the fraudulent deeds to obtain funding for, and close, the B-C Transactions.

      a.    For example, during a recorded meeting with CW-1, defendant GOODSON stated, in response to a question about whether he had trouble getting a higher appraisal for a B-C Transaction when the A-B Transaction had just recently occurred at a much lower price, "No, I backdate the deed

either 30 to 60 days."

11.   It was further part of the scheme to defraud that defendant GOODSON, defendant GARVIN, and others used false and fraudulent representations and material omissions to induce B-C Financial Institutions to issue mortgage loans for the B-C Transactions. Among other things, the Co-Conspirators' fraudulent deeds were incorporated into title reports that the B-C Financial Institutions relied upon in deciding whether to issue loans.

12.   It was further part of the scheme to defraud that defendant GOODSON and others discussed paying real estate agents cash bribes to alert defendant GOODSON and others to potential Subject Properties that had not yet been listed on the Multiple Listing Service, a public clearinghouse for real estate listings.

      a.   For example, during a recorded meeting with CW-2, defendant GOODSON stated, among other things, "The biggest challenge – and this is what everybody has the challenge with – is finding deals that work, alright? . . . So you get a source of properties that are below market.  Now, you must have connections with agents? . . . Most of the time [the real estate agents] don't have anything, um, but if you know them on that personal level, you need to get at them before anyone else.  If somebody has a listing, they can direct that listing to you – Suzy agent gets a call from, um, somebody whose parents just died and they're trying to sell their property.  She can put it on the [Multiple Listing Service], and they go out and do it – the – find the 3 highest bidders and compete the bidders against themselves, or, she can call Joe, and Joe, um, puts the property under contract immediately and then gives her 10 thousand dollars.  Cash, in a bag, under the table. . . . You need – you need – some way, you need to be able to get deals that nobody else is getting.  Right?  And she puts them on the MLS, there – if it's on the MLS one day, you're out of the game. . . . And [the real estate agents are] gonna – they're gonna want something other than what's on the HUD[-1]."

13.   Defendant GOODSON understood that fraud pervaded the short sale transactions, in part, because he and others acting at his behest typically played multiple roles in the overlapping A-B and B-C Transactions.

      a.   For example, in some transactions, defendant GOODSON and/or employees of the GLO: negotiated the terms of the short sale with the A-B Financial Institution for the A-B Transaction; provided fraudulent "pre-approval letters" from Five Star; served as the closing attorney for the A-B Transaction; and served as the B Owner's attorney in the B-C Transaction.

b.     For certain transactions, defendant GOODSON received and then distributed proceeds of B-C Transactions that were either closed by defendant GOODSON or by other closing attorneys or settlement agents. Accordingly, defendant GOODSON knew that the A-B Transaction either (1) was not closed when the B-C Transaction closed, or (2) closed on a date later than the date reflected in the deed.

c.     Moreover, defendant GOODSON knew that the funds from certain B-C transactions actually were used to fund A-B transactions, because, among other reasons, he was serving as the attorney for one or both of the parties on the A-B Transaction and released those funds from his attorney trust account.

14.     It was further part of the scheme to defraud that defendant GOODSON actively concealed from the Financial Institutions that he played multiple roles in the short sale transactions.

15.     It was further part of the scheme to defraud that defendant GOODSON and others used the GOODSON ATA to divide the proceeds of the fraudulent transactions.

16.     It was further part of the scheme to defraud that defendant GOODSON and entities he controlled profited in three primary ways: first, defendant GOODSON owned or controlled entities that served as the B Owner for certain transactions; second, defendant GOODSON received attorney's fees from one or both of the parties to the A-B and/or B-C Transactions; and, third, defendant GOODSON caused Five Star to make profitable short-term loans to fund certain of the fraudulent transactions.

17.     Had the A-B Financial Institutions been aware of the parties involved in and timing of the impending B-C Transactions, in which the Subject Property would be sold in very short order at a markedly higher price, the A-B Financial Institutions would not have approved the A-B Transactions. Furthermore, if the B-C Financial Institutions had been aware of the parties and timing of the A-B Transaction and that the B Owner had obtained or (in those instances in which the A-B Transactions had not closed) expected to obtain the Subject Property at a markedly lower amount than the sale price for the B-C Transactions, the B-C Financial Institutions would not have approved the new mortgage loan to the C Owner.

## V.     ILLUSTRATIVE FRAUDULENT TRANSACTIONS

18.     The following section summarizes three transactions to illustrate how the fraudulent scheme operated.  It does not reveal each and every Subject Property involved in the scheme, nor every method by which the Co-Conspirators

executed their scheme.

### A.     142 Van Nostrand Avenue, Jersey City, N.J.

19.     In or around 2001, Person A purchased 142 Van Nostrand Avenue, Jersey City, N.J. ("142 Van Nostrand"). PERSON A's mortgage for 142 Van Nostrand was subsequently acquired and serviced by Financial Institution 1.

20.     By in or around 2011, Person A was unable to make the payments on Person A's mortgage. Person A responded to an advertisement in a newspaper that claimed to purchase homes for cash. Person A then began interacting with CC-1, who made various representations to Person A, including that Person A would receive cash from a short sale of 142 Van Nostrand.

21.     CC-1 brought Person A to defendant GOODSON's law offices, where defendant GOODSON made additional representations to Person A, including that Person A did not make enough money to qualify for a federal loan repayment program, and that Person A's best option was therefore to engage in a short sale.

22.     Person A did not attend any closing of 142 Van Nostrand.  Rather, Person A, with CC-1's assistance, moved to North Carolina.  CC-1 paid for Person A's bus ticket, and assured Person A that Person A's possessions would be shipped to Person A  When Person A's possessions never arrived, Person A returned to Jersey City to find them discarded in dumpsters near 142 Van Nostrand.

### 1.     Fraudulent Representations to Financial Institution 1

23.     Defendant GOODSON and others negotiated the A-B Transaction for 142 Van Nostrand.  As part of this negotiation, defendant GOODSON and others caused numerous false and fraudulent documents to be sent to Financial Institution 1, some of which are described below.

24.     On or about September 8, 2011, defendant GOODSON caused a completed form real estate contract to be faxed to Financial Institution 1 ("Contract 1"). Contract 1 identified "Grant Montgomery" as the prospective B Owner of 142 Van Nostrand, and a proposed $72,000 purchase price. Contract 1 omitted several material facts, including that (a) "Grant Montgomery" was not an individual, but rather was a corporate entity formed and controlled by defendant Goodson named "Grant Montgomery LLC;" (b) the address listed for "Grant Montgomery" was defendant GOODSON's home address; and (c) "Grant" and "Montgomery" were the first two names of a relative of defendant GOODSON.

25.     On or about September 8, 2011, defendant GOODSON also caused to be faxed to Financial Institution 1 a "pre-approval letter" on Five Star

letterhead indicating that purported purchaser Grant Montgomery was pre-approved for a loan of up to approximately $57,600 ("Pre-Approval Letter 1"). Pre-Approval Letter 1 falsely indicated that Five Star had reviewed a credit report, pay stubs, W-2 statements, debt to income ratios, and asset documentation for "Grant Montgomery." As a corporate entity, however, Grant Montgomery had no such documentation, and, in any event, Five Star conducted no such analysis because both it and Grant Montgomery were controlled by defendant GOODSON. Pre-Approval Letter 1 also falsely claimed that "Grant Montgomery" would be providing a down payment of approximately 20%. In fact, Grant Montgomery LLC never provided any down payment in connection with the purchase of 142 Van Nostrand. Finally, the "pre-approval letter" bore the signature of Individual 1 as "Vice President" of Five Star, but Individual 1 did not actually sign the letter and was not actually a "Vice President."

26.    On or about September 8, 2011, defendant GOODSON also caused to be faxed to Financial Institution 1 a draft HUD-1, showing Person A as the seller, "Grant Montgomery" as the buyer, "Five Star" as the lender, defendant GOODSON as the closing attorney. This draft HUD-1 also included numerous fraudulent misrepresentations, including that Grant Montgomery provided a down payment of $1,000 (which it did not), and that Grant Montgomery would be providing an additional $16,800 at closing (which it did not).

27.    On or about December 21, 2011, Financial Institution 1 received a fax that included a "Power of Attorney" document that was purportedly signed by Person A on or about June 11, 2011. Person A told law enforcement that Person A did not sign the Power of Attorney.

### 2.    Executing the A-B and B-C Transactions on 142 Van Nostrand

28.    Defendant GOODSON negotiated the B-C Transaction while he negotiated and served as closing attorney for the A-B Transaction. Defendant GOODSON did not disclose his role in the B-C Transaction to Financial Institution 1. On or about October 7, 2011, defendant GOODSON obtained a signed and executed contract for the B-C Transaction on 142 Van Nostrand in the amount of $142,500. On or about November 8, 2011, defendant GOODSON and others sent a contract for the A-B Transaction to be sent to Financial Institution 1 in the amount of $102,000.

29.    On or about November 10, 2011, Financial Institution 1 approved the A-B Transaction, based in part on the false and fraudulent documents sent and caused to be sent by defendant GOODSON and others.

30.    On or about December 7, 2011, a deed was recorded on 142 Van Nostrand for the A-B Transaction. The cost of recording this deed was paid from

a bank account controlled by defendant GOODSON. The deed was signed by an attorney who had been associated with defendant GOODSON. The deed was notarized by an employee of defendant GOODSON, and it was returnable to defendant GOODSON's law office.

31.     In fact, however, there was no closing for the A-B Transaction on 142 Van Nostrand on December 7, 2011.

32.     Rather, defendant GOODSON and others closed both the A-B and the B-C Transactions for 142 Van Nostrand on or about the same day—December 22, 2011. The B-C Transaction closed for a sale price of approximately $142,500. The A-B Transaction closed for a sale price of approximately $102,000. By structuring the short sale flip in this manner, defendant GOODSON and the Co-Conspirators paid for the A-B Transaction with the proceeds of the B-C Transaction.

### 3.     The Flow of Funds for 142 Van Nostrand

33.     On or about December 22, 2011, as part of the B-C Transaction, a check of approximately $124,859.43 from the attorney trust account of the C Owner's closing attorney was deposited in the GOODSON ATA. The remainder of the funds for the B-C Transaction was disbursed in connection with the B-C Transaction.

34.     Also on or about December 22, 2011, defendant GOODSON and others caused Five Star Funding to send a wire to Financial Institution 1 to pay off Financial Institution 1 approximately $92,400 for the A-B Transaction. This was the amount that defendant GOODSON and others negotiated for the short sale, and was less than the outstanding mortgage balance.

35.     Then, approximately one week later, on or about December 29, 2011, defendant GOODSON and others caused a wire to be sent from the GOODSON ATA to Five Star in the amount of approximately $98,260. This amount reimbursed Five Star for Five Star's payoff of the mortgage in the A-B Transaction one week earlier. These funds came from money paid to the GOODSON ATA as part of the B-C Transaction.

36.     The co-conspirators then split the profits from the 142 Van Nostrand A-B and B-C Transactions. For example:

      a.     Grant Montgomery LLC (the B Owner), which was controlled by defendant GOODSON, received approximately $26,600.

      b.     Five Star Funding, which was controlled by defendant GOODSON, received approximately $6,284.

c.      Defendant GOODSON received approximately $4,000 for serving as the closing attorney for both transactions.

d.      CC-1 received approximately $1,800.

e.      Other individuals associated with GLO received a total of approximately $13,083.

**B.      62 Mina Avenue, Clifton, N.J.**

37.      In or around 2008, an individual with the initials Person B purchased the property located at 62 Mina Avenue, Clifton, New Jersey ("62 Mina"). Person B's mortgage for 62 Mina was held by Financial Institution 3.

38.      By in or around 2010, Person B was having difficulties paying the mortgage on 62 Mina, which was held by Financial Institution 3. Person B's sister put Person B in contact (by phone) with CC-2, who suggested to Person B that Person B engage in a short sale on 62 Mina. Person B never met CC-2 in person.

39.      CC-2 played several roles in the fraudulent scheme, including notarizing documents in connection with certain fraudulent transactions (such as, but not limited to, documents involved in the 62 Mina transactions). CC-2 also sent Person B a series of forms relating to the A-B Transaction for 62 Mina, which Person B signed in or around January 2011.

**1.      Fraudulent Representations to Financial Institution 3**

40.      Defendant GOODSON negotiated the A-B Transaction short sale on 62 Mina. As part of this negotiation, defendant GOODSON and others caused numerous false and fraudulent documents to be sent to Financial Institution 3.

41.      On or about March 18, 2011, defendant GOODSON caused to be faxed to Financial Institution 3 a "pre-approval letter" on Five Star letterhead indicating that purported purchaser "Entity 2" was pre-approved for a loan of up to approximately $124,800. ("Pre-Approval Letter 2"). Pre-Approval Letter 2 listed CC-3, who controlled Halcyon, as the managing member.  This letter falsely indicated that a credit report, pay stubs, W-2 statements, debt to income ratios, and asset documentation for "Entity 2" had been reviewed. In fact, no such documents had been reviewed. Pre-Approval Letter 2 also reflected a signature by Individual 1, but Individual 1 has stated to law enforcement that Individual 1 never signed the letter.

42.      Also on or about March 18, 2011, defendant GOODSON caused to be sent to Financial Institution 3 a draft HUD-1, showing Person B as the seller,

"Entity 2" as the buyer, "Five Star" as the lender, defendant GOODSON as the closing attorney – due $5,000 in total attorney's fees – half from the buyer and half from the seller.   This draft HUD-1 also included numerous fraudulent misrepresentations, including that Entity 2 provided a down payment of $1,000 (which it did not), and that Entity 2 would be providing an additional $33,600 at closing (which it did not).

43.    During the course of their negotiations with Financial Institution 3, defendant GOODSON and others caused multiple versions of these fraudulent documents to be sent to Financial Institution 3.

## 2.    Executing the A-B and B-C Transactions on 62 Mina

44.    Unbeknownst to Person B and to Financial Institution 3, GOODSON was simultaneously negotiating the B-C Transaction for 62 Mina for far more than the A-B Transaction. Before the A-B Transaction closed, defendant GOODSON and CC-3 had obtained two different signed contracts for the B-C Transaction. Each of these contracts were for approximately $100,000 more than the A-B Transaction closing price of approximately $184,280.

45.    On or about July 20, 2011, as part of the documentation provided to Financial Institution 3, CC-4 signed a "Realtor/Broker Listing Agent Certification," which stated, in part, that "Seller's Broker acknowledge[s] and agree[s] that the subject property has been listed on the local Multiple Listing Service at fair market value to provide open competitive bids to present to seller as per the terms of seller/agent listing agreement and that the marketing is in fact and 'in spirit' seeking to maximize the selling price of the property." CC-4 submitted this in connection with the loan package for the approximately $184,280 purchase price for the A-B Transaction.

46.    CC-4, however, well knew that there was no effort in the A-B Transaction "to maximize the selling price" of 62 Mina, either "in fact" or "in spirit," because CC-4 also served as the listing agent for the 62 Mina B-C transaction, and was aware that, approximately one month before signing the "Realtor/Broker Listing Agent Certification," a contract had been signed for the B-C Transaction for approximately $280,000.

47.    On or about August 23, 2011, Financial Institution 3 approved the A-B Transaction, based in part on the false and fraudulent documents sent and caused to be sent by defendant GOODSON and others – and after defendant GOODSON and others had obtained two separate signed contracts for the B-C transaction at a much higher price.

48.    On or about October 5, 2011, the A-B Transaction closed for 62 Mina. As part of the closing, a HUD-1 was prepared and signed by defendant

GOODSON, reflecting a closing date of October 5, 2011.

49.     On or about October 20, 2011, defendant GOODSON and others generated and recorded a deed for the A-B Transaction for 62 Mina. This deed was:

      a.     paid for from an account controlled by defendant GOODSON; signed by defendant GOODSON;

      b.     notarized by CC-2, an associate of CC-3 (the principal of the B Owner); and

      c.     returnable to defendant GOODSON's law office. The notarization on the deed falsely declared that Person B had appeared personally before CC-2; in fact, however, as noted above, Person B never met CC-2.

50.     The deed falsely reflected a closing date of June 3, 2011.

51.     The C Owner obtained a FHA-insured mortgage to complete the B-C Transaction. As discussed above, such a mortgage requires the B Owner to own the property for 90 days or more before the B-C Transaction for which the FHA mortgage loan insurance is sought if the B-C Transaction purchase price is significantly higher than the A-B Transaction purchase price.

52.     The B-C Transaction did not legitimately qualify as an FHA loan, however. It occurred less than 90 days after the B Owner purchased 62 Mina, and was for much more than the B Owner had paid.

53.     To make the B-C Transaction mortgage appear eligible for FHA loan insurance, defendant GOODSON and others conspired to deceive Financial Institution 4 and the FHA into believing that the B Owner bought 62 Mina on or about June 3, 2011, by fraudulently backdating the deed to that date.

54.     Accordingly, defendant GOODSON and others closed the A-B Transaction on 62 Mina on or about October 7, 2011 for a sale price of approximately $198,000. The B-C Transaction on 62 Mina closed on or about December 5, 2011 for a sale price of approximately $280,000 – approximately $82,000 more than the A-B Transaction had closed for just two months prior.

### 3.     The Flow of Funds for 62 Mina

55.     The purchase price for the A-B Transaction was actually composed, in part, of the down payment provided by the C Owner for the B-C Transaction. Specifically:

      a.     On or about October 3, 2011, a check was deposited into the GOODSON ATA in the amount of approximately $4,000 drawn on the C Owner's bank account. The memo line of the check was "Down payment (House)." This amount corresponds to the down payment amount on the HUD-1 for the B-C Transaction.

      b.     The remainder of the money for the A-B transaction came from a relative of CC-3 (approximately $75,000 on or about October 5, 2011) and from Five Star (approximately $105,280.25 on or about October 6, 2011), for a total of approximately $184,280.25.

      c.     On or about October 7, 2011, defendant GOODSON caused a wire of approximately $184,980 to be sent to Financial Institution 3 to pay off the A Owner's mortgage on 62 Mina and close the A-B Transaction short sale.

56.     On or about December 5, 2011, the closing attorney for the B-C Transaction sent approximately $248,000 in two checks to the GOODSON ATA. The co-conspirators then split the profits from the 62 Mina A-B and B-C Transactions. For example:

      a.     Defendant GOODSON received approximately $2,000 each for serving as an attorney on the two closings on 62 Mina. Both of those $2,000 checks, however, were actually disbursed out of the funds for the B-C Transaction.

      b.     Five Star disbursed approximately $125,825 in connection with the closing of the A-B Transaction, and received back approximately $140,924 from the GOODSON ATA, for a profit of approximately $15,099.

      c.     Grant Montgomery LLC, an entity controlled by defendant GOODSON but with no ostensible connection to the 62 Mina Transactions, received approximately $4,247, disbursed from the GOODSON ATA. Accordingly, defendant GOODSON and his entities profited a total of approximately $23,346.

      d.     The relative of CC-3, who paid approximately $75,000 on or about October 5, 2011 for the A-B Transaction, received approximately $84,000 on or about December 13, 2011, for a profit of approximately $9,000.

      e.     The B Owner and CC-3 received approximately $22,730 in connection with the closing of the B-C Transaction.

i. The B Owner then paid approximately $6,234 of its profit to "Roma Financial Group," which was controlled by CC-2 (who notarized the fraudulent deed), and whose name is a portmanteau of the first and last names of CC-2.

f. CC-4 profited approximately $12,090 for serving as the real estate agent on both the A-B and the B-C Transactions for 62 Mina.

## C. 2515 Adam Place, Union City, NJ

57. In or around 2006, Person C purchased the property located at 2515 Adam Place, Union City, NJ ("2515 Adam"). Person C's mortgage for 2515 Adam was owned and serviced by Financial Institution 2.

58. In or around 2012, Person C was having difficulties paying the mortgage on 2515 Adam. Person C was acquainted with defendant GARVIN through family connections. GARVIN learned that Person C was behind on Person C's mortgage. GARVIN suggested to Person C that Person C conduct a short sale, and that GARVIN could handle the paperwork. Person C gave GARVIN verbal permission to work with the financial institution and to sign all paperwork on Person C's behalf.

### 1. Fraudulent Representations to Financial Institution 2

59. Defendant GARVIN, CC-5, and others then negotiated the A-B Transaction on 2515 Adam. As part of this negotiation, the Co-Conspirators caused numerous false and fraudulent documents to be sent to Financial Institution 2.

60. For example, defendant GARVIN and CC-5 submitted to Financial Institution 2 at least two purchase contracts for 2515 Adam with Person C listed as the seller and Caviar Apparel listed as the buyer: On or about October 23, 2012, CC-5 submitted to Financial Institution 2 a purchase contract dated September 17, 2012 listing Person C as the seller and Caviar Apparel as the buyer with a purchase price of $80,000. On or about December 31, 2012, CC-5 submitted to Financial Institution 2 a purchase contract dated September 17, 2012 listing Person C as the seller and Caviar Apparel as the buyer with a purchase price of $91,000.

61. Both contracts were purported to be signed by Person C as the seller, when in fact they were not. Both contracts were also purported to be signed by M.F., who was listed as a member of Caviar Apparel. In fact, Caviar Apparel was formed by defendant GARVIN in January 2009 in the State of New Jersey. Since its inception, only two other individuals have been listed as members or officers of Caviar Apparel, neither of which were M.F. Moreover, defendant GARVIN

opened and maintained a bank account in the name Caviar Apparel.

62.    As another example, on or about February 7, 2013, defendant GARVIN, defendant GOODSON, and CC-5 caused to be submitted an "Affidavit of Arm's Length Transaction" form to Financial Institution 2 (the "Arm's Length Affidavit").  The Arm's Length Affidavit included the signatures of Person C as the seller, defendant GOODSON as Escrow/Closing Agent, and CC-5 as the "Seller's agent."  The Arm's Length Affidavit represented, among other things, that:

        a.    "Neither the Borrower(s) nor the purchaser(s) will receive any funds or commissions from" the A-B Transaction; and

        b.    "There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to [Financial Institution 2]."

63.    The Affidavit was false.  In fact, defendant GARVIN, defendant GOODSON, CC-5 and others knew, but concealed from Financial Institution 2, that a contract was already in place for the 2515 Adam B-C Transaction for a significantly higher amount.

64.    Specifically, on or about November 20, 2012, a purchase contract for the B-C Transaction was submitted to Financial Institution 5, in which defendant GARVIN's entity, Caviar Apparel, was the seller, and defendant GARVIN was the buyer.  The contract was dated November 16, 2012 with a purchase price of $265,000. The contract was signed by defendant GARVIN as the buyer and by CC-5 for the seller, Caviar Apparel.

### 2.    Executing the A-B and B-C Transactions on 2515 Adam

65.    Defendant GOODSON, defendant GARVIN, and others closed the B-C Transaction before closing the A-B Transaction, and used the funds from the B-C Transaction to pay off the negotiated short sale amount (an amount less than the outstanding mortgage balance) with Financial Institution 2 on 2515 Adam.  In addition, defendant GARVIN used false and fraudulent documents to convince Financial Institution 5 to provide him with a mortgage for 2515 Adam.  Further, defendant GARVIN essentially acted as both the seller and the buyer in the B-C Transaction, and profited by selling 2515 Adam to himself at a much higher price.

66.    Defendant GARVIN formed Caviar Apparel in January 2009 and continued to be listed as the registered agent and hold a bank account in the name of Caviar Apparel prior, during, and after the A-B and B-C transactions.

67.    On or about December 7, 2012, defendant GARVIN caused a fax to be sent to Financial Institution 5 relating to the B-C Transaction. The fax concealed defendant GARVIN's relationship to Caviar Apparel by identifying CC-5 as the person controlling Caviar Apparel.

68.    The December 7, 2012 fax also included numerous false and fraudulent documents sent by defendant GARVIN to Financial Institution 5 to induce Financial Institution 5 to provide defendant GARVIN with a mortgage for 2515 Adam.  For example, the fax included a URLA, defendant GARVIN's W-2, and purported pay stubs for defendant GARVIN.  Each of these documents contained false information.  For example:

    a.    The pay stubs for defendant GARVIN were fraudulent.  The payroll processing company which purportedly issued the pay stubs has no record of ever having issued pay checks to either defendant GARVIN or the entity for which defendant GARVIN supposedly worked; and

    b.    The URLA listed bank accounts for defendant GARVIN with combined assets of approximately $22,000.  Defendant GARVIN then sent bank statements to Financial Institution 5 purporting to support the assets listed in the URLA.  These bank statements were fraudulently altered to show far higher balances than defendant GARVIN actually held in those accounts.

69.    On or about February 5, 2013, the co-conspirators caused a false and fraudulent deed to be filed for the A-B transaction.  The deed falsely stated that it was prepared by Person C and included the signature of Person C  In fact, however, Person C did not prepare or sign the deed.  The deed was fraudulently notarized by CC-6, an employee of defendant GARVIN, and was made returnable to Caviar Apparel at an address controlled by defendant GARVIN.  Finally, the deed falsely reflected a closing date of July 9, 2012.

70.    But there was no closing of the A-B Transaction on July 9, 2012.  Rather, the co-conspirators closed the B-C Transaction first, on or about February 7, 2013.

71.    Indeed, defendant GOODSON, defendant GARVIN, and others closed the B-C Transaction for 2515 Adam on the very day – February 7, 2013 – that they each signed the false Affidavit claiming that there were "no agreements, understandings, or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed" to Financial Institution 2 relating to the A-B Transaction.

72.    On or about February 14, 2013, Defendant GOODSON caused a HUD-1 Settlement Statement to be submitted to Financial Institution 2 for the

A-B Transaction.  This HUD-1 stated that the closing for the A-B Transaction took place on February 7, 2013, with GLO listed as the settlement agent.

73.    The HUD-1 falsely stated that the A-B Transaction was funded by "cash from borrower" in the amount of approximately $97,690.  This was not true.  In fact, the funds for the A-B Transaction were not transferred until February 13, 2013.  On that date, the GOODSON ATA wired approximately $75,176 to Financial Institution 2 to fund the A-B Transaction.  Thus, defendant GOODSON used the proceeds of the B-C Transaction to fund the A-B Transaction.

### 3.    The Flow of Funds for 2515 Adam

74.    On or about February 6, 2013, based on the fraudulent representations made by defendant GARVIN, defendant GOODSON, CC-5, and others, Financial Institution 5 wired approximately $207,263.34 to the attorney trust account of the B-C closing attorney to fund the B-C Transaction.  Then, on or about February 8, 2013, also as part of the B-C Transaction, the B-C closing attorney sent a check for approximately $198,274.42 to the GOODSON ATA. (The remainder of the approximately $207,263.34 were disbursed in connection with the B-C Transaction.)

75.    Among the disbursements was a check dated February 20, 2013 in the amount of $2,000 and issued to Caviar Apparel Purveyors, LLC.  The memo of the check listed the name of CC-5.  The check was deposited into a bank account held by defendant GARVIN in the name of Universal Rental Exchange, another company owned and controlled by defendant GARVIN.  Defendant GARVIN is the sole signor on that account.

76.    On or about February 13, 2013, defendant GOODSON used some of the funds from the B-C Transaction to close the A-B Transaction and disperse profits received to the conspirators.

77.    Specifically, and among other things, on or about February 13, 2013, defendant GOODSON initiated a wire transfer from the GOODSON ATA to Financial Institution 2 in the amount of approximately $75,176, as well as a wire transfer from the GOODSON ATA to Financial Institution 6 in the amount of approximately $5,500 (which held a second mortgage on 2515 Adam) to pay off the short sale for 2515 Adam.

78.    Accordingly, after paying off the amount needed for the A-B Transaction, defendant GOODSON had approximately $117,598.42 in profits from the B-C Transaction to disburse.  On or about February 13, 2013, defendant GOODSON caused the majority of the remaining profit from the 2515 Adam Transactions to be disbursed.  For example:

     a.     Caviar Apparel (the purported B Owner), which was controlled by Defendant GARVIN, received a total of approximately $97,294.62.

     i.     Defendant GARVIN subsequently shuttled the funds through various bank accounts owned and controlled by him. The funds were then used by Defendant GARVIN to pay other conspirators, personal expenses, and finance other suspected fraudulent transactions.

     ii.     From one such account, defendant GARVIN caused a check to be issued in the name of CC-5 in the amount $2,500. The check's memo line indicated that the payment was for the 2515 Adam transaction.

     b.     Defendant GOODSON received approximately $4,000.